**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

─────────────────────────────────

**UNITED STATES OF AMERICA,**

               **Plaintiff,**

               **v.**                         **05-CR-0332S**

**TONY ROOKARD,**

               **Defendant.**

─────────────────────────────────

## REPORT, RECOMMENDATION AND ORDER

       This case was referred to the undersigned by the Hon. William M. Skretny, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions.

## PRELIMINARY STATEMENT

       The defendant, Tony Rookard ("the defendant"), is charged in a multicount indictment with having violated Title 18 of the United States Code, Sections 922(g)(1) and 922(k) and Title 21 of the United States Code, Section 844(a). (Docket No.  7).

       The defendant has filed a motion seeking suppression of evidence (Docket # 12) and a suppression hearing was conducted by this Court on March 28, 2006.

## **FACTS**

On the evening of November 5, 2005, Officers Pasquale Panaro and Ray Harrington of the Buffalo Police Department ("BPD") were assigned to patrol E District in the City of Buffalo which was considered a "high crime area."  (T. 5-6).[1] Sometime between 10:30 and 11:00 p.m. of that evening, while driving south on Lonsdale Street, a one-way street, and approaching East Ferry Street, Officer Panaro, who was driving the marked police patrol car, observed a vehicle parked alongside the east curb of Lonsdale "with smoke coming out of the tail pipe" which indicated the motor was running.  (T. 8).  He decided to approach this vehicle because of the "heavy tints" on the windows and because it was "parked there and no one else was around the vehicle outside."  He "wanted to determine if someone was inside the vehicle operating it, make sure it wasn't a steal (sic)."  (T. 8).  He drove his patrol car along side the parked vehicle and "using [his] spotlight, [he] shined (sic) it on the passenger side window."  (T. 9).

He observed "a young black male sitting in the passenger seat with both arms raised up and another black male behind the driver's wheel."  (T. 10).  The passenger, the defendant in this case, had a cell hone in his left hand and money in his right hand.  Upon the spotlight shining into the car, the passenger "dropped his right hand very rapidly down out of [Officer Panaro's] sight towards his waist."  (T. 10, 43).

---

[1] Reference is to the transcript of the suppression hearing held by this Court on March 28, 2006 and the appropriate pages in said transcript.

Officer Panaro considered this to be a "furtive movement" (T. 40) because "when [the defendant] dropped his right hand down to his waist, he felt "threatened." (T. 45). Thereupon, Officer Panaro exited his "vehicle very rapidly and yelled at [the defendant] to get his hands up." The defendant did not comply, and Officer Panaro repeated the command but the defendant did not comply. (T. 10). As a result, Officer Panaro "opened the vehicle door - took [his] left hand and grabbed the defendant's right shoulder, all the while telling him to get his hands up and [Panaro] took him out of the car, placed him up against that vehicle and told him to put his hands on top of the hood of that vehicle." (T. 12).

Officer Panaro removed the defendant from the vehicle "because [he] was concerned for [his] safety that (sic) [he] couldn't see [the defendant's] hand" and "thought maybe [the defendant] was going for a weapon that could harm [him]." (T. 12-13). The officer asked the defendant "if he had any weapons on him" but the defendant did not respond. Officer Panaro then advised the defendant that he "was going to pat him down for [the officer's] safety and to stay still." (T. 13). While so patting him down, Officer Panaro "felt the outline of a gun right at [the defendant's] waist area" which was the same area that he had previously observed the defendant place his hand while seated in the vehicle. (T. 13-14, 52). As a result, Officer Panaro "stepped back and drew [his] weapon" and "placed it to the back of [the defendant's] neck and ordered him to the ground" to which the defendant complied. (T. 14). He then "yelled to [his] partner, Officer Harrington, that [the defendant] has a gun, watch the other guy." (T. 14). Officer Panaro then placed the defendant in handcuffs.

Officer Harrington asked the driver of the vehicle "to get out and he was handcuffed immediately." (T. 14). After the driver of the vehicle was secured by Officer Harrington, Officer Panaro "went right to the area where [he] felt that weapon and [he] retrieved that from [the defendant's] pocket." (T. 14). It was "a Smith & Wesson 40 caliber high point handgun." (T. 15). Officer Panaro also found "crack cocaine in [the defendant's] right front pants pocket." (T. 15). Officer Panaro considered the defendant "under arrest when [he] found the weapon" and the "crack cocaine was found after he was placed under arrest." (T. 16). Officer Panaro then placed the defendant in the back seat of his patrol car. (T. 16). In the meantime, Lt. John King of the BPD arrived on the scene (T. 16) as did Officer Russ Medina, a BPD canine officer along with his trained dog, Roney. (T. 17-18).

After conferring with Officer Panaro, Officer Medina spoke with the driver of the vehicle in question and then proceeded to the vehicle with his dog and "worked" the dog around the vehicle. Officer Medina "looked into the vehicle" and found a gun" underneath the back seat of that vehicle." (T. 17-18).

Officer Panaro also measured the "tint" on the windows of the vehicle in question and determined that the "tint" was illegal in that it only allowed eleven percent of light to enter the vehicle. As a result, two summons were issued. (T. 19-21). Lt. King, after being briefed by Officers Panaro and Harrington as to what had transpired, asked the officers if the defendant, who was sitting in the back seat of the patrol car, had been given a *Miranda* warning and was advised that such warning had not been

-4-

given.  (T. 72).  Thereupon, Lt. King proceeded to the patrol vehicle and introduced himself to the defendant and informed the defendant that he was under arrest and then "recited his (sic) Miranda warnings to him."  (T. 72-73, 91).  After so advising the defendant of his rights, the defendant acknowledged that he understood.  (T. 73).  The defendant did not request a lawyer (T. 73).  At this point in time, Officer Medina had arrived on the scene and Lt. King left the patrol car and proceeded to brief Officer Medina "and accompanied him while the dog searched the vehicle."  (T. 73-74).  The dog first "worked" the perimeter of the vehicle and then the interior of the vehicle.  While the dog was in the rear seat, [it] alerted on the rear seat."  As a result, Officers Medina and Harrington "removed the lower portion of the rear seat, pulled it up and discovered a weapon at that location."  (T. 74).  Lt. King then returned to the patrol car and once again engaged the defendant in conversation wherein the defendant advised that both guns found were his as were the drugs.  (T. 79; *See* Government Exhibit 5).[2]

## DISCUSSION AND ANALYSIS

_____The defendant asserts that he "was subjected to a warrantless *Terry* stop and frisked on nothing more than an after-the-fact allegation that he made 'suspicious and furtive movements' when BPD officers approached a vehicle he was sitting in" and therefore, "the totality of the circumstances compel the conclusion that the BPD officers acted unconstitutionally" and "all evidence must be suppressed."  (Docket #12, pp. 4-5).

---

[2] Counsel for the defendant has represented that the defendant is not questioning the "voluntariness" of the statements made by the defendant, but rather, questions "whether [the defendant] was given his Miranda warnings."  (T. 77-78).

In opposition to the defendant's motion to suppress the evidence, the government argues that the police officers "acted appropriately relative to the incident in question and that defendant Rookard's Fourth Amendment rights were not violated" and therefore, the defendant's motion to suppress the firearms that form the basis of the charges against the defendant as well as any statements made by the defendant at the time of his arrest" should be denied.  (Docket #15, pp. 13-14).

The primary issue in this case is whether the police were justified in their actions that resulted in the "pat down" of the defendant and the search and seizure of the weapons and drugs in question under the principles espoused in *Terry v. Ohio*, 392 U.S. 1 (1968).

The decision of the United States Supreme Court in *United States v. Arvizu*, 534 U.S. 266 (2002), reiterates and summarizes the principles established in *Terry* and its progeny as follows:

> The Fourth Amendment prohibits "unreasonable searches and seizures" by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest.  *Terry v. Ohio*, 392 US 1, 9, 20 L Ed 2d 889, 88 S Ct 1868 (1968); *United States v. Cortez*, 449 US 411, 417, 66 L Ed 2d 621, 101 S Ct 690 (1981). Because the "balance between the public interest and the individual's right to personal security," *United States v. Brignoni-Ponce*, 422 US 873, 878, 45 L Ed 2d 607, 95 S Ct 2574 (1975), tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to

believe that criminal activity "'may be afoot,'" *United States v. Sokolow*, 490 US 1, 7, 104 L Ed 2d 1, 109 S Ct 1581 (1989) (quoting *Terry, supra*, at 30, 20 L Ed 2d 889, 88 S Ct 1868).  See also *Cortez*, 449 U.S, at 417, 66 L Ed 2d 621, 101 S Ct 690 ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity").

When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.  See, *e.g., id.,* at 417-418, 66 L Ed 2d 621, 101 S Ct 690.  This process allows officers to draw on their own experience and specialized training to make inferences from the deductions about the cumulative information available to them that "might well elude an untrained person."  *Id*., at 418, 66 L Ed 2d 621, 101 S Ct 690.  See also *Ornelas v. United States*, 517 US 690, 699, 134 L Ed 2d 911, 116 S Ct 1657 (1996) (reviewing court must give "due weight" to factual inferences drawn by resident judges and local law enforcement officers).  Although an officer's reliance on a mere "'hunch'" is insufficient to justify a stop, *Terry, supra*, at 27, 20 L Ed 2d 889, 88 S Ct 1868, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard, *Sokolow, supra*, at 7, 104 L Ed 2d 1, 109 S Ct 1581.

Our cases have recognized that the concept of reasonable suspicion is somewhat abstract.  *Ornelas, supra*, at 696, 134 L Ed 2d 911, 116 S Ct 1657 (principle of reasonable suspicion is not a "finely-tuned standar[d]'"); *Cortez, supra*, at 417, 66 L Ed 2d 621, 101 S Ct 690 (the cause "sufficient to authorize police to stop a person" is an "elusive concept").  But we have deliberately avoided reducing it to "'a neat set of legal rules,'" *Ornelas, supra*, at 695-696, 134 L Ed 2d 911, 116 S Ct 1657 (quoting *Illinois v. Gates*, 462 US 213, 232, 76 L Ed 2d 527, 103 S Ct 2317 (1983)).  In *Sokolow*, for example, we rejected a holding by the Court of Appeals that distinguished between evidence of ongoing criminal

> behavior and probabilistic evidence because it "create[d]
> unnecessary difficulty in dealing with one of the relatively
> simple concepts embodied in the Fourth Amendment."  490
> US, at 7-8, 104 L Ed 2d 1, 109 S Ct 1581.

*Id.* at 273-274.

In the case at bar, we are not concerned with an actual stop of the vehicle in which the defendant was a passenger since the vehicle was parked at the curb with the motor running when the police approached it.  (T. 8).  Nevertheless, in order to make a "reasonable suspicion determination," the totality of the circumstances in this case must be considered in order to conclude whether the police officers had a "particularized and objective basis" for undertaking their actions.  *Id.*

Officer Panaro testified that it was sometime between 10:30 and 11:00 p.m. when they came upon the parked vehicle with heavily tinted windows with its motor running in a known high crime area.  (T. 8).  As part of his responsibilities as a police officer, he "wanted to determine if someone was inside the vehicle operating it, [and] make sure it wasn't a steal (sic)."  (T. 8).  This certainly was good policing and constituted a legitimate police objective.  In carrying out this objective, he drove his patrol car along side the parked vehicle and shone his patrol car spotlight onto the passenger side window of the vehicle.  (T. 9).  This action did not constitute an illegal search of the vehicle for as the Second Circuit Court of Appeals has stated:

> [A] police officer's looking through the windows into the
> vehicle from outside, even when shining a flashlight to
> illuminate the inside of the vehicle, does not constitute a
> "search" of the vehicle within the meaning of the Fourth
> Amendment.  *See New York v. Class*, 475 U.S. 106, 118,
> 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) (locations inside an
> automobile, in plain view of persons outside the automobile,
> are not "subject to a reasonable expectation of privacy");
> *Texas v. Brown*, 460 U.S. 730, 740, 103 S.Ct. 1535, 75
> L.Ed.2d 502 (1983) ("There is no legitimate expectation of
> privacy shielding that portion of the interior of an automobile
> which may be viewed from outside the vehicle by either
> inquisitive passerby or diligent police officers.") (citations
> omitted) (plurality of four Justices; other five Justices
> concurring in judgment and disagreeing on unrelated
> grounds); *id*. at 739-40, 103 S.Ct. 1535 ("It is . . . beyond
> dispute that [the officer's] action in shining his flashlight to
> illuminate the interior of [defendant's] car trenched upon no
> right secured . . . by the Fourth Amendment."); *United States
> v. Ocampo*, 650 F.2d 421, 427 (2d Cir. 1981) (holding that,
> even though a police officer needed to use a flashlight to
> illuminate the inside of a lawfully stopped car, the item
> glimpsed was "in 'plain view'").

*Mollica v. Volker*, 229 F.3d 366, 369 (2d Cir. 2000).

It was at this point in time that Officer Panaro observed the defendant with "both of his arms raised up" and a cell phone in his left hand and money in his right hand.  (T. 10).  However, when the spotlight shone upon the defendant, he immediately "dropped his right hand very rapidly down out of [Officer Panaro's] sight towards his waist."  (T. 10, 43).  Officer Panaro, a police officer with approximately fifteen (15) years of police experience (T. 3-4), testified that he considered this to be a "furtive movement" by the defendant and that "when [the defendant] dropped his right hand down to his waist" he felt "threatened."  (T. 40, 45).  There is no legal requirement that Officer Panaro had to "be absolutely certain that [defendant was] armed; the issue is whether a

reasonably prudent man in the circumstances would be warranted in the belief that his

safety or that of others was in danger." *Terry*, 392 U.S. at 27; *see also Sibron v. New*

*York*, 392 U.S. 40, 64 (1968).

> The degree of suspicion, the location of the stop, the time of
> day, the reaction of the suspect to the approach of police are
> all facts which bear on the issue of reasonableness.

*United States v. Harley*, 682 F.2d 398, 402 (2d Cir. 1982).


This was a situation where the police were investigating a matter in a high

crime area, late at night and confronted by an individual whose actions were deemed to

be "a strange movement" by Officer Panaro (T. 38) and to be a "furtive movement."

(T. 40).  Considering the time of the evening and the location in a "high crime area"

along with the reaction of the defendant to the presence of the police, it is the opinion of

this Court that Officer Panaro was "reasonably prudent" in his belief that his safety and

that of his fellow Officer Harrington were in danger.  Therefore, he was legally justified

in taking "reasonable steps to protect himself" and his fellow officer, "regardless of

whether probable cause to arrest exist[ed]."  *United States v. Alexander*, 907 F.2d 269,

272 (2d Cir. 1990), *cert. denied*, 498 U.S. 1098 (1991); *see Terry*, 392 U.S. at 23-24

(recognizing "interest of the police officer in taking steps to assure himself that the

person with whom he is dealing is not armed with a weapon that could unexpectedly

and fatally be used against him").  His act of exiting his patrol car and directing the

defendant "to get his hands up" (T. 10) was reasonable.  Since the United States

Supreme Court has ruled that the ordering of a passenger out of a car is a minimal

intrusion on personal liberty when compared to officer safety, *Maryland v. Wilson*, 519

U.S. 408, 409 (1997), the order issued by Officer Panaro to the defendant to raise his

hands while seated inside the vehicle is certainly "equally minimal."  *United States v.*

*Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997); *see also Pennsylvania v. Mimms*, 434 U.S.

106, 111 (1977); *Mollica v. Volker, supra* at 369.

       When the defendant failed to comply with Officer Panaro's repeated

commands to raise his hands, Officer Panaro was justified in taking further action in the

interest of his safety and that of Officer Harrington.  Because he "couldn't see [the

defendant's] hand" and "thought maybe [the defendant] was going for a weapon that

could harm [him]," (T. 12-13), Officer Panaro decided to physically remove the

defendant from the vehicle so as to ensure his safety.  This was done by "open[ing] the

vehicle door and physically removing the defendant from the vehicle and "plac[ing] him

up against that vehicle and [telling] him to put his hands on top of the hood of the

vehicle."  (T. 10-12).

       The fact that the defendant was removed from the vehicle by Officer

Panaro before the weapon in question was discovered is of no legal consequence.

Officer Panaro had the right to remove the defendant from the vehicle for safety

reasons while he conducted his investigation and such removal was not violative of the

Fourth Amendment's proscription of unreasonable seizures.  *Pennsylvania* v. *Mimms*,

434 U.S. 106, 111 (1977); *Maryland* v. *Wilson*, 579 U.S. 408, 415 (1997); *Molica* v.

-11-

*Volker*, 229 F.3d 366, 369 (2d Cir. 2000).

Since Officer Panaro was reasonable in his belief that his safety may have been in jeopardy by reason of the defendant possibly having a weapon, he was justified in conducting a "pat down" on the defendant.  As the United States Supreme Court has stated:

> Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions.  Our decisions recognize the serious threat that armed criminals pose to public safety; *Terry's* rule, which permits protective police searches on the basis of reasonable suspicion rather than demand that officers meet the higher standards of probable cause, responds to this very concern.  *See* 392 US, at 30, 20 L Ed 2d 889, 88 S Ct 1868.

*Florida v. J.L.*, 529 U.S. 266, 272 (2000).

The Court of Appeals for the Second Circuit has expressly stated that an "investigating officer may frisk an individual for weapons if the officer reasonably believes that person to be armed and dangerous" citing *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 21 L.Ed.2d 612 (1972) and *McCardle v. Haddad*, 131 F.3d 43, 49 (2d Cir. 1997).  *United States v. Colon*, 250 F.3d 130, 134 (2d Cir. 2001).

When Officer Panaro "felt the outline of a gun right at [the defendant's] waist area," which was the same area that he had previously observed the defendant place his hand while seated in the vehicle (T. 13-14), Officer Panaro had a legal right to

take further precautionary steps to protect his and Officer Harrington's safety by
"stepp[ing] back and [drawing his] weapon" and plac[ing] it to the back of [the
defendant's] neck and order[ing] him to the ground."  (T. 14).  *See Dempsey v. Town of
Brighton,* 749 F. Supp. 1215 (W.D.N.Y. 1990) (officer's decision to stop vehicle
containing individual who matched description of suspect in armed bank robbery and
order occupants of the vehicle to crawl out of the vehicle and lay down on the grass,
and to handcuff their wrists behind their back while conducting a pat down search, was
reasonable), *aff'd* 940 F.2d 648 (2d Cir.) (unpublished table decision), *cert. denied*, 502
U.S. 925 (1991); *see also United States v. Laing*, 889 F.2d 281, 285 (D.C. Cir. 1989)
("The amount of force used to carry out the stop and search must be reasonable, but
may include using handcuffs or forcing the detainee to lie down to prevent flight or
drawing guns where law officers reasonably believe they are necessary for their
protection."), *cert. denied* 494 U.S. 1008 and 494 U.S. 1069 (1990); *United States v.
Taylor*, 716 F.2d 701, 709 (9th Cir. 1983) ("requiring the suspect to lie down while a frisk
is performed, if reasonably necessary, does not transform a Terry stop into an arrest").

> A limited search for weapons, without a warrant and
> without probable cause, is also permissible in connection
> with a lawful custodial interrogation that does not
> rise to the level of an arrest, *see, e.g.* (*Terry* v. *Ohio*, 392
> U.S. 1, 21, 88 S. Ct. 1868, 1879-80, 20 L. Ed. 2d 889 (1968)
> ("*Terry*"), on the rationale that "[i]f a suspect is 'dangerous,'
> he is no less dangerous simply because he is not arrested,"
> Michigan v. Long, 463 U.S. 1032, 1050, 103 S. Ct. 3469, 3481,
> 77 L. Ed. 2d 1201(1983).  Further, the suspect need
> not actually be dangerous to validate such a limited - purpose
> search, so long as the officer has a reasonable belief
> that the suspect poses a danger and may have a

weapon within his reach.

*McCardle* v. *Haddad*, 131 F. 3d 43, 48 (2d Cir. 1997).


The fact that Officer Panaro drew his weapon and placed it against the defendant's neck did not convert the *Terry* stop at this stage of the investigation into an arrest of the defendant.  As the Court of Appeals for the Second Circuit has stated:

> A display of guns by the police . . . does not automatically convert a stop into an arrest.

*United States v. Nargi*, 732 F.2d 1102, 1106 (2d Cir. 1984).


Further, courts "would be heartless if [they] did not share the officers' concern for their own safety.  As Judge Meskill aptly stated, we cannot impose on law enforcement personnel the hobson's choice of keeping their guns holstered when to do so 'increases the risk that (they) will be shot'.  *United States v. Jackson, supra*, 652 F.2d at 49."  *United States v. Harley*, 682 F.2d 398, 402 (2d Cir. 1982).


The subsequent protective search of the defendant by Officer Panaro resulted in the finding and seizure of a "Smith & Wesson 40 caliber high point handgun" (T.15) as well as "crack cocaine in [the defendant's] right front pants pocket."  For the foregoing reasons stated, this search and seizure of the evidence from the defendant was not done in violation of the defendant's Fourth Amendment rights and therefore, it is RECOMMENDED that this motion to suppress the evidence on that basis be

DENIED.

As a result of finding the weapon and drugs on the defendant, the defendant was placed under arrest by Officer Panaro.

The search of the passenger compartment of the vehicle from which the defendant had been removed and seizure of the weapon found under the back seat of that vehicle by Officer Medina was also legal.

> [W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile.

*New York v. Belton*, 453 U.S. 454, 460 (1981); *Thornton v. United States*, 541 U.S. 615, 620 (2004).

With regard to the defendant's attempt to suppress the use of his statements made to Lt. King, it is also RECOMMENDED that this motion be DENIED. The testimony of Lt. King at the suppression hearing clearly established that prior to his interrogating the defendant after he had been placed under arrest and put in the back seat of the police car, he expressly recited the *Miranda* warnings to the defendant and properly advised him of his legal rights as part of that process (T. 72, 73, 91), which the defendant acknowledged he understood.  (T. 73).

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed. R. Crim. P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.</u>** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and

the basis for such objection and shall be supported by legal authority." **Failure to**

**comply with the provisions of Rule 58.2, or with the similar provisions of Rule 58.2**

**(concerning objections to a Magistrate Judge's Report, Recommendation and**

**Order), may result in the District Judge's refusal to consider the objection.**


**S/ H. Kenneth Schroeder, Jr.**
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**


**DATED:**    **Buffalo, New York**
              **January 26, 2007**